Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | John A. Nordberg | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 7771 | **DATE** | 3/15/2000 |
| **CASE TITLE** | Raytheon Engineers vs. SMS Schloemann-Siemag | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]    For the foregoing reasons, Plaintiff's Motion for a Preliminary Injunction against SMS to restrain and enjoin SMS from any action in furtherance of its "Request for Arbitration" filed with the International Chamber of Commerce Court of Arbitration under Reference No. 10 665/BWD is GRANTED. The injunction is to take effect upon the Plaintiff posting a $150,000 surety bond. The court further orders SMS to file a written request to withdraw its erroneously filed request for arbitration with the ICC (and attach a copy of this order to that request).

(11) ■    [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | **Document Number** |
| | No notices required. | number of notices | |
| | Notices mailed by judge's staff. | MAR 1 6 2000 | |
| | Notified counsel by telephone. | date docketed | 8 |
| ✓ | Docketing to mail notices. | 15 | |
| | Mail AO 450 form. | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | |
| TP | courtroom deputy's initials | date mailed notice | |
| | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

RAYTHEON ENGINEERS & )
CONSTRUCTORS, INC. )
    Plaintiff, )
)    No. 99 C 7771
v. )
)    HONORABLE JOHN A. NORDBERG
SMS SCHLOEMANN-SIEMAG )
AKIENGESELLSCHAFT, )
    Defendant. )

## MEMORANDUM OPINION AND ORDER

DOCKETED

MAR 1 6 2000

Plaintiff Raytheon Engineers & Constructor's, Inc. ("Raytheon") filed a three count complaint against Defendant SMS Schloemann-Siemag Akiengesellschaft[1] ("SMS") seeking a preliminary/permanent injunction against arbitration (Count I), damages for breach of contract (Count II), and indemnification (Count III). Raytheon subsequently filed a Motion for a Temporary Restraining Order against arbitration until the court could rule on Raytheon's requested injunction. This court granted Raytheon preliminary injunction in a summary order on 3/9/00; the summary order provided that a full Memorandum Opinion and Order would soon issue detailing that decision. This is that Memorandum Opinion and Order.

## BACKGROUND

In 1994, Raytheon entered into a Engineering, Procurement and Construction Contract ("contract") with Acme Steel Company ("Acme") to construct a Compact Strip Production Plant, Roller Hearth Furnace, Ladle Metallurgy Furnace and related support and structural facilities in

---

[1] Defendant indicates the current entity name is SMS Demag Aktiengesellschaft.



Riverdale, Illinois. As part of the agreement between Acme and Raytheon, Acme required Raytheon to purchase all major steel and production equipment from SMS. In July 1994, Raytheon and SMS entered into a Contract for a Compact Strip Production Plant -- Purchase Order No. 9191.001-D01("subcontract"). (In SMS's phraseology, Raytheon was simply the "turnkey contractor.") Pursuant to the subcontract, SMS assumed a host of responsibilities, including the design, engineering, fabrication, supply, and related activities for the installation of the core steel production equipment for the plant, for which SMS was to receive $159,420,200. SMS maintains its compensation could be and was adjusted through change orders.

The subcontract contains three relevant provisions, which are presented below, in relevant portion.[2]

Article 11 - Dispute Resolution

11.1 <u>Resolution by parties</u>

> The Buyer and Seller intend that this Agreement shall operate fairly and reasonably, and, where required, shall be interpreted in a manner consistent with the intent of the parties. In the event any disputes arise between the parties regarding the application or interpretation of this Agreement, or any of the other Contract Documents, Buyer's Project Manager and Seller's Project Manager shall use their best good faith efforts to reach a reasonable, equitable and mutually agreed upon resolution of the item, or items, in dispute. If the Buyer's Project Manager and the Seller's Project Manager are unable to resolve such matter(s) within fifteen (15) days, either may refer the disputed matter(s), by written notice, to a senior officer of each party. In the event such senior officers cannot resolve the disputed matter(s) within the further period of fifteen (15) days, the parties shall use their best efforts to agree, within a further ten (10) day period, upon an appropriate method of non-judicial dispute resolution, including mediation or arbitration. In the event of a disputed matter(s), each side shall make available to the other such data and information as may be reasonably requested as necessary to resolve said disputed matter(s).

---

[2] Our review is somewhat handicapped by the fact that neither party has provided a copy of the complete subcontract or third party agreement.

2

The pendency of a disputed matter(s) and the implementation, or pendency, of any non-judicial dispute resolution method shall not relieve either party from its duty to perform under the Contract Documents.

11.2 <u>Arbitration</u>

In the event the parties shall decide that any disputed matter(s) arising out of or related to the Contract Documents shall be resolved by arbitration, such dispute(s) shall be determined by arbitration in accordance with the Provisions of the Commercial Arbitration Act of the International Chamber of Commerce (the "Rules") as follows:....[summarized rules phrased with mandatory "shall" language].....

Article 30 - <u>Exclusivity of Remedies</u>

30.1 Notwithstanding anything contained herein to the contrary, the remedies stated in the Agreement shall be exclusive.

Needless to say, disputes arose amongst the parties, the claimed details of which are irrelevant for purposes of evaluating Raytheon's request for an injunction. Suffice to say, SMS maintains that it is owed millions of dollars by Raytheon; Raytheon maintains that SMS breached its contractual responsibilities; and Raytheon further alleges that Acme has asserted that SMS has breached its subcontract, which has prompted Acme to raise claims against Raytheon and draw on Raytheon's letter of credit. The parties attempted to resolve some elements of the dispute via a separate contract -- the Agreement to Resolve Certain Claims ("third party agreement") -- between Raytheon, Acme and SMS. The future of the third party agreement is in doubt, however, because Acme has filed a voluntary petition for bankruptcy.[3]

---

[3] Raytheon's counsel informed the court at the 3/9/00 hearing that Acme has filed an adversary action against Raytheon in the bankruptcy court. Counsel also represented that, to date, Acme has not filed such a claim against SMS.

After further lengthy and fruitless attempts to settle their differences with Raytheon, SMS filed a Request for Arbitration with the International Chamber of Commerce Court of Arbitration, Reference No. 10 665/BWD. This prompted Raytheon file this action and ask the court to enjoin SMS from proceeding with the arbitration case. SMS maintains that the arbitration is mandatory under the subcontract. Raytheon maintains that the arbitration clause in the subcontract is optional, and only applies if both parties agree to arbitrate a dispute.

## LEGAL STANDARDS

In deciding whether to grant injunctive relief, a court must consider four criteria: (1) whether plaintiff has a reasonable likelihood of success on the merits; (2) whether the plaintiff will have an adequate remedy at law or will be irreparably harmed if the injunction does not issue; (3) whether the threatened harm to the plaintiff outweighs the threatened harm the injunction may inflict upon the defendant; and (4) whether the granting of the injunction will harm the public interest. *Plummer v. American Institute of Certified Public Accountants*, 97 F.3d 220, 229 (7th Cir. 1996). If a plaintiff is seeking a permanent rather than a preliminary injunction, the first factor is modified to whether the plaintiff has in fact succeeded on the merits. *Id.*

"[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Geneva Securities, Inc. v. Johnson*, 138 F.3d 688, 691 (7th Cir. 1998)(internal cite omitted). Further, the question of whether the parties agreed to arbitrate is for the court rather than the arbitrator, unless the parties have clearly agreed otherwise. *Id. See also Independent Truck Builders Union v. Nacco Materials Handling Group, Inc.*, No. 99-1251, 2000 WL 66373 at *2 (7th Cir. Jan. 27, 2000). In

deciding whether the parties agreed to arbitrate a certain matter, the court should apply normal contract principles. *First Options of Chicago v. Kaplan*, 514 U.S. 938, 944 (1995). While there is a federal policy in favor of arbitration, that policy does not give the courts "a license to compel arbitration absent an agreement to do so." *Adamovic v. Metme Corporation*, 961 F.2d 652, 654 (7th Cir. 1992)(presumption in favor of arbitration only attaches after enforceable arbitration clause exists). Significantly, the use of the word "may" or similar "optional" language in an arbitration clause does necessarily render the provision permissive. *See Ceres Marine Terminals, Inc. v. International Longshoreman's Association*, 683 F.2d 242, 246 (7th Cir. 1982)(collective bargaining agreement); *Akzo Chemicals, Inc. v. Anderson Development Company*, No. 93 CV 0498, 1993 WL 54548 at *2 (N.D. Ill. Feb. 26, 1993). Nonetheless, if an arbitration clause is equally susceptible to two interpretations(mandatory/permissive), the ambiguity is best resolved by turning to extrinsic evidence at an evidentiary hearing. *Adamovic*, 961 F.2d at 654.

## DISCUSSION

The primary focus of the parties' materials is the first factor: likelihood of success on the merits. Raytheon takes the position that the arbitration provision is permissive, and that neither party is obligated to arbitrate unless both parties agree to arbitrate. SMS takes the position that the permissive language is irrelevant and that arbitration is mandatory for the following reasons: (1) that there is a strong policy in favor of arbitration; (2) that the arbitration rules are phrased in mandatory "shall" language, which effectively negates any earlier permissive language; (3) that the contract makes the listed remedies "exclusive," therefore, if the arbitration clause is not mandatory, the parties could disagree in perpetuity with no means of resolution because going to

5

court is not a listed remedy; (4) that parties can always voluntarily agree to arbitrate, so it makes no sense to explicitly include a permissive arbitration clause in a contract; and (5) that the issue of whether the arbitration provision is mandatory should be decided by an arbitrator.

First, there is no indication in the subcontract that the parties have clearly and unequivocally agreed to submit the issue of arbitrability to an arbitrator. As such, the question of whether there is a binding provision requiring arbitration is one for the court. *See Geneva Securities,* 138 F.3d at 691. Second, SMS's emphasis on the federal policy favoring arbitration is premature. That policy does not carry any weight until an enforceable agreement to arbitrate is found; the policy itself cannot create an agreement to arbitrate out of whole cloth. *See Adamovic,* 961 F.2d at 654.

This court's review of the relevant language yields the unescapable conclusion that Raytheon is not required to arbitrate this dispute because SMS has no unilateral right to compel arbitration under the subcontract. Section 11.1 of the subcontract gives the parties the option of arbitrating a dispute only if both parties agree to arbitrate the dispute. The court notes that the entire focus of Section 11.1 is upon negotiation and attempts to reach an agreement. Significantly, there is no requirement to agree nor any stated consequences for failing to agree. Moreover, the non-judicial options are not limited to arbitration; mediation is specifically listed, and mediation is traditionally non-binding. Lastly, Section 11.2, which SMS stresses for its mandatory "shall" language regarding arbitration procedures, is drafted in a manner that contemplates an initial, affirmative decision by both parties to opt for arbitration.

SMS's arguments to the contrary are unpersuasive. The argument that "may" and similar permissive language can still yield a mandatory arbitration clause, relying on cases such as *Ceres*

and *Akzo*, falters for three reasons. First, the language in Section 11.1, particularly in the context of the entire provision, clearly intends that arbitration will only occur if both parties agree to it. Second, to the extent *Ceres* and *Akzo* resolved ambiguity in favor of arbitration (ambiguity that does not exist here), they conflict with the holding of *Adamovic*. Third, if the parties intended to grant a unilateral right to impose arbitration they obviously knew how do so. In Section 11.1, only a few words before the arbitration language, the parties grant each other the unilateral right to elevate negotiations from project managers to senior officers upon written notice. If they intended the same result for the arbitration provision, they would have explicitly so provided.

The argument that, because the subcontract does not specifically list litigation as a remedy, an optional arbitration clause leaves the parties locked in eternal negotiations without redress, falls flat. The courts have been a forum for resolving contract disputes for centuries, and bringing a civil action is an option whether its is specifically provided for in a contract or not. An exception to this rule is if the parties explicitly foreclose taking their dispute to the courts. That is not the case here, as the court has concluded arbitration is optional in the subcontract. Further, Section 30.1, the exclusivity of remedies provision, does not appear nearly as significant as SMS claims. The subcontract appears to contain detailed provisions for liquidated damages and other specific consequences for failure to perform. As such, Section 30.1 relates more to restrictions on the relief available rather than any restrictions on the forum in which the relief can be sought.

SMS also argues that, because parties can always agree to arbitrate, including an optional arbitration provision would be an empty redundancy. This argument fails as well. Contracts frequently contain provisions that are not strictly necessary, either due to the draftsman's desire for completeness or simply his verbosity. That appears to be the case here. For example, parties

7

can always attempt to work out their difficulties themselves in the event of a contract dispute. So there's no reason, to use SMS's logic, to add such a provision to a contract. Yet Section 11.1 explicitly includes two specific levels of such "informal" dispute resolution negotiations. The parties apparently desired to spell out as much as possible.

The other three factors that must be addressed before entering an injunction need be addressed only briefly. Raytheon has no adequate remedy at law. If the dispute is arbitrated, Raytheon would lose unlimited judicial review of its claim (versus the narrow review a court may give an arbitrator's award). *See Chicago School Reform Board v. Diversified Pharmaceutical Services, Inc.*, 40 F.Supp.2d 987, 995-96 (N.D. Ill. 1999). Further, forcing a party to arbitrate a dispute that it has not agreed to arbitrate is irreparable harm. *Id.* at 996. The balance of harms also favors the injunction, as the parties' contract is being enforced as written and the parties' dispute can be adequately resolved by this court.[4] Public interest also favors the injunction. While there is a public policy in favor of arbitration, that only applies when contracting parties have agreed to arbitrate. The public interest is not served by needlessly barring access to the courts.

In summary, the court holds that Raytheon is entitled to a preliminary injunction. The court has made the injunction preliminary rather than permanent at this point because the injunction does not end the case; the merits of the commercial dispute have yet to be resolved. The court anticipates that a permanent injunction would be entered at the end of the case, if

---

[4] Significantly, SMS's counsel stated that her client's primary interest is getting the commercial dispute resolved expeditiously, whether its arbitrated, tried here, or addressed in the bankruptcy court. This court is clearly an adequate forum to expeditiously resolve the dispute.

appropriate. As to the required security, Raytheon is required to post a $150,000 surety bond. A bond of this size is appropriate, as $150,000 is the amount of required fees that SMS has paid to the ICC to proceed with the arbitration.

## CONCLUSION

For the foregoing reasons, Plaintiff's Motion for a Preliminary Injunction against SMS to restrain and enjoin SMS from any action in furtherance of its "Request for Arbitration" filed with the International Chamber of Commerce Court of Arbitration under Reference No. 10 665/BWD is GRANTED. The injunction is to take effect upon the Plaintiff posting a $150,000 surety bond. The court further orders SMS to file a written request to withdraw its erroneously filed request for arbitration with the ICC (and attach a copy of this order to that request).

**ENTER:**

*/s/ John A. Nordberg*
**JOHN A. NORDBERG**
**Senior United States District Judge**

DATED: *March 15, 2000*